IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ALICIA D. AVANT,<br><br>        Plaintiff,<br><br>  vs.<br><br>ANDREW SAUL, Commissioner of the<br>Social Security Administration[1];<br><br>        Defendant. | **8:18CV331**<br><br>**MEMORANDUM AND ORDER** |

This is an action for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner"). Alicia Avant appeals a final determination of the Commissioner denying her application for Social Security benefits. This Court has jurisdiction under 42 U.S.C. § 405(g).

## I.    BACKGROUND

### A.  Procedural History and Introductory Information

On March 17, 2015, and November 9, 2015, plaintiff Alicia D. Avant filed applications for disability benefits under Titles II and XVI of the Social Security Act, respectively, alleging that she became disabled on March 14, 2014, which was later amended to September 9, 2014.  Filing No. 1, Complaint ("Complaint") at 1.[2]  Following a June 28, 2017, hearing, an administrative law judge ("ALJ") denied benefits.  Filing No.

---

[1] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019, for a six-year term that expires on January 19, 2025.  He is substituted for Carolyn W. Colvin, former Commissioner, and/or Nancy A. Berryhill, former acting Commissioner, as Defendant.

[2] Avant's attorney amended the alleged onset date to indicate that Avant did not become disabled until the date that she began treatment for her skin disease at the CHI Dermatology Clinic.  Filing No. 15, Social Security Transcript ("Tr. 1") at 38.  *See* Tr. 1 at 322.

15, Social Security Transcript ("Tr. 1") at 32-75.[3]  On May 9, 2018, the Appeals Council denied review, and the ALJ's decision stands as the final decision of the Commissioner. *Id.* at 1-6.  Avant seeks review of the ALJ's order denying benefits.  Filing No. 1 at 2.

Alicia Avant is now forty-one years old.  Filing No. 15-2 Tr. at 24.  She has previous relevant work experience as a phlebotomist, Certified Nursing Assistant, and general cashier/store laborer.  *Id.*  Avant has a high school education and can communicate in English.  *Id.*  Her most recent full-time employment position was at CSL Plasma, which culminated in March of 2014.  Filing No. 15-7 at 222.  Avant earned nominal wages as a self-employed dog breeder in 2015.  Filing No. 15-2 at 46.  At the time of her application for benefits, Avant contended that she was unable to work because of migraines, nerve and joint pain, depression, and palmoplantar keratoderma.  Filing No. 15-3 at 95.[4]

### B.  Claimant's Relevant Testimony at the ALJ Hearing

At the hearing on June 28, 2017, Avant testified that she is a high school graduate and attended college for two years but never obtained a degree.  Filing No. 15-2 at 41. The ALJ asked Avant if she possessed a certificate in any specialized vocational training beyond her college courses, and she responded that she had "a phlebotomy, a medication aide," but that said certificate expired because of a lack of renewal.  *Id.* at 41-42.[5]  Avant affirmed that her most recent job was in 2015 as a phlebotomist, but she was terminated "because of [her] conditions."  *Id.* at 42.[6]  Avant acknowledged that a document

---

[3] Due to the extensive nature of the Social Security Administrative Record of Avant's case, the transcript is divided into two sections: Filing No. 15 (Tr. 1: 1-509) and Filing No. 16 (Tr. 2: 510-968).
[4] Avant alleged disability primarily because of severe palmoplantar keratoderma.  *See* Filing No. 15-2 at 50.  *See generally id.* at 22 (stating that palmoplantar keratoderma is a genetic condition which produced painful skin thickening on the palms of Avant's hands, knuckles, and the soles of her feet).
[5] The record demonstrates that Avant is a former phlebotomist.  *See, e.g.,* Filing No. 15-7 at 261.
[6] Although the ALJ initially established that Avant was unemployed since 2015, he later declared that the record demonstrated that her last job culminated in March of 2014, and Avant concurred.  Filing No. 15-2 at 42.

in her file showed earnings at Motivating Graphics LLC and Royal Baths Manufacturing in late 2015 and 2016; this evidence is the result of identify theft for which Avant filed a police report. *Id.* at 43-45.

When questioned concerning whether she was ever self-employed, Avant confirmed that she was a dog breeder in 2015, and that wages in her record from 2015 were a result of dog breeding. *Id.* at 46. Avant affirmed that dog breeding was intermittent, and she stated that "[dog breeding] was not planned, but I – went ahead and [sold the puppies]." *Id.* She subsequently testified that dog breeding was not full-time work and that she never earned significant wages from that venture. *Id.*

Avant testified that she worked full-time at AMES Convenience Store from 2008—2012, where she was a cashier and a gas station attendant. *Id.* at 45, 48. She acknowledged that that job required her to stand for most of the day. *Id.* at 47. Avant stated that she had to stock the shelves twice per week and, as the only person in the store, "[she] had to do everything." *Id.* at 48. Avant declared that the heaviest thing she lifted during the course of her employment was a box of liquor bottles, which she estimated weighed greater than fifty pounds. *Id.*

Avant asserted that the main reason she could not return to any of her past work, and would also be inept at any other job, was her hands. *Id.* at 50. When asked to describe the hand impairment, Avant stated that she experienced "constant tingling," "cramps where [her hands] stopped moving or working," that skin continuously grew (and she therefore could not bend), and that she endured stiffness in both of her hands (since she is right handed, the stiffness was worse in her right hand). *Id.*

The ALJ asked Avant for examples of activities that her hand impairment prevented her from doing, and Avant expressed reluctance but testified that she was precluded from "a lot of things like combing [her] hair, wiping [herself] . . . cooking, and taking care of [her fourteen-year-old] daughter." *Id.* at 50-51. Avant further testified that she lived only with her daughter and their dogs and remarked that she was embarrassed that she could only manage her housework and personal care with the help of her daughter. *Id.* at 51. Avant stated that, although her parents also helped out a lot, "sometimes a lot of things [didn't] get done." *Id.*

When the ALJ questioned Avant regarding her ability to prepare meals, she explained that she used to cook frequently, but that at the time of the hearing she could only cook something that was "not a whole meal, something really easy" – it had to be something small and microwavable. *Id.* Avant elaborated upon her cooking difficulties: she insisted that she did not have the dexterity to hold pans and other kitchen utensils and that she sometimes burned herself because she could not feel hot or cold temperatures. *Id.* at 51-52.[7]

Avant testified that pain and numbness extends beyond her hands up her arms to both elbows and both shoulders, and that she regularly has shoulder pain. *Id.* at 52. She stated that she was incapable of lifting her arms overhead and insisted that she was fully impeded from operating a computer or typing on a keyboard. *Id.* at 52-53. The ALJ asked her to explain why she could not operate a computer, and Avant replied that she could

---

[7] The ALJ asked Avant to elaborate upon the meaning of her testimonial phrase "dexterity to hold." She responded that she could grab, for example, a pan or a gallon of milk, but that she could hold it for only ten seconds, at which point she would drop it because she could not feel. *Id.* at 52.

not move or hold her wrists in the required positions, and she could not feel the keys on a keyboard.  *Id.* at 53.

Additionally, Avant declared that she had trouble operating touchscreens, as her fingers did not register.  *Id.*  The ALJ subsequently inquired about whether Avant could send text messages or make phone calls on a cell phone.  *Id.*  Avant replied that it was difficult to operate a cell phone, and she used Bluetooth, "where like when you text, you can talk . . . you press the button and talk and then it prints it out for you."  *Id.* at 53-54.  She maintained that texting took long because she would press the screen, but her skin condition precluded the device from registering the contact.  *Id.* at 54.

Avant testified that her daughter accompanied her when she grocery shopped, and the heaviest thing she could pick up was a water bottle.  *Id.*  The ALJ asked Avant about limitations regarding her ability to sit or stand, and she responded that she had "generalized local pain in [her] joints" and that "[she could not] sit too long, [she could not] stand too long."  *Id.*  Avant estimated that she could stand for fifteen minutes before she needed to sit or rest because of the pain in the back of her legs, her back, and her ankles. *Id.* at 54-55.  She further approximated that she could continuously sit for ten minutes. *Id.* at 55.[8]  The ALJ asked Avant if he was correct in his conclusion that she could stand for ten to fifteen minutes, and then she needed to sit for ten to fifteen minutes before she needed to stand up again, and Avant affirmed this inference.  *Id.*  Avant testified that this cycle was consistent with any activity, whether it be laundry, cooking, etc.  *Id.*

Avant affirmed that she could fold clothes, but that she could not button a shirt and while she could tie a shoe, "it might not stay tied, it might not be tight."  *Id.* at 55-56.  The

---

[8] During the proceeding, mid-testimony, Avant told the ALJ that she "itch[ed] to stand up."  *Id.*

ALJ asked Avant to consider how much time she was on her feet during an average day, and she testified that "really pushing it" she was on her feet about an hour per day, "and [she was] really pushing it." *Id.* at 56. Avant asserted that during an eight-hour workday, if she stood for a total of an hour, that did not mean she could sit for the other seven hours. *Id.* Rather, she testified that the maximum duration she could sit out of those eight hours was roughly thirty to forty-five minutes. *Id.* at 57.

The ALJ deduced that it was harder for Avant to sit than to stand, and Avant affirmed this determination. *Id.* Avant testified that it was more difficult for her to sit than to stand because of pain in her leg. *Id.* The ALJ questioned Avant about her methods of pain relief, and she responded:

> I'm learning this – all this chronic pain is kind of new to me, so I'm kind of feeling my way through it to see what's best for me. They say to move around as much as possible, so I try to do that. But if I move around too much, I get swollen hands, swollen ankles, swollen feet. So, I try to just, you know – I have a handful of stuff that I can do and – I try to do it.

*Id.* Avant further testified that her pain got progressively worse when she worked as a phlebotomist. *Id.* at 57-58. She stated that about two months into her employment, in 2011 or 2012, she was in a car accident, but she was within a ninety-day probationary period and was not supposed to miss work, so she worked through her injury because "[she] really needed the job." *Id.* at 58. Avant testified to another, separate car accident in March of 2016, wherein she strained her neck. *Id.*

Avant was then asked to describe her "skin issue which popped up in late '14." *Id.* Regarding her skin impairment, Avant declared:

> It's one hundred times worse than it was ten years ago. I just thought it was something aesthetic, you know, something that was just looking, you know, that it looks bad. But progression, the hands started to swell, the skin started to get thicker. It was just a very slow progression of things going wrong. The nails

grow really funny, it's just – it was just like long, kind of long progression and then it just sped up. And now, I'm at where I'm at now.

*Id.* at 59. Avant testified that prior to the onset of her skin condition, she could hold or grab things with her hands and could, for example, use a computer, comb her hair, and put her hair in a ponytail. *Id.* Moreover, Avant stated that driving for a long period of time was difficult and affirmed that she could not drive for longer than forty-five minutes. *Id.* at 59-60. She testified that her hands cramped up and weakened so she could not control the steering wheel. *Id.* at 60. She stated that she did not have the strength to keep her hands on the steering wheel and drive and estimated that she could drive for approximately thirty to forty-five minutes. *Id.*

The ALJ inquired about migraine headaches noted in the medical records, and Avant testified:

> I keep a tinge of a headache every day. It's up to me to try to control it to keep it from flaring up. And if they flare up, I have – end up going to the emergency room because I can't stop the pain, the throwing up, the not being able to see, things like that.

*Id.* Avant testified that she constantly has a "tinge" of a headache, but that severe headaches last for three to five days. *Id.* at 60-61. Avant stated that "if [she] did not do what [she was] supposed to do like drink [her] water, do [her] tea, do things that all [her] neurologists [said] to do," then her headaches flared up "until [she] decide[d] to stop fighting it or go to the emergency room." *Id.* at 61. Avant testified that it took her a few days to recover after one of the more severe headaches subsided. *Id.*

Avant stated that she received treatment for her migraines, the skin disorder on her hands, the extremity pain in her arms and legs, and fibromyalgia. *Id.* at 61-62. Avant testified that her primary physician at the CHI Health Clinic was Dr. Drvol, and that the

only doctor she saw outside of the CHI health system was her rheumatoid doctor.  *Id.*  at 62.

Avant's attorney then questioned her.  *Id.* at 62-65.  The attorney asked Avant if there was any job that she could do for forty hours per week if she had an option to sit, stand, or move around as needed, and Avant responded that she would be precluded from such full-time employment.  *Id.* at 63.  When the attorney asked Avant what would preclude her from a simple job, Avant testified:

> My hands, I mean, you use your hands for everything.  You don't realize how much you move your fingers, how much you move your wrist.  You don't realize how much you do that until it hurts all the time to do that.  So, I like to do my jobs the best that I possible can especially working in healthcare.  And I don't want to be responsible for hurting someone or not doing my job properly because I couldn't do it properly.

*Id.* Avant stated that her hand skin condition equally impacted her feet.  *Id.*  The attorney asked Avant to describe how the skin condition affected her feet, and Avant declared:

> The same as the hands, the – it's very thick.  The skin just continually grows.  And right now, I can't afford the medicine that might help a little bit.  It will help it out a little bit, but it puts pressure points on the feet also.  So, it's really hard to walk at times when the skin gets really, really thick.

*Id.* at 63-64.  Avant testified that she experienced the foot pain every day.  *Id.*  Avant testified that it was difficult to wear shoes and that she only had two pairs; she always wore socks, could not wear heels, and was careful about what shoes she bought.  *Id.* at 65.

Avant stated that she relieved the pain with soaps and maintained the skin as much as she was able, but that the pain in her hands made it difficult to also maintain her feet. *Id.* at 64.  She affirmed that at one point in time, she had a medication that consisted of "several different things" mixed in with Vaseline.  *Id.*  While the record indicated that this

medication helped, Avant no longer had it because she could not afford it.  *Id.*  She testified that the medication was one hundred dollars per month and came in a four-ounce container.  *Id.*

Avant asserted that she could not walk long distances and testified that while she did not know the measurements, she estimated she could walk "maybe a half a block." *Id.* at 65.  She testified that she walked around the block near her home; she took her dog down to the end of the block and back up.  *Id.*

When the ALJ asked Avant whether, besides the dog and the occasional walk, she had any activities for leisure or enjoyment, Avant stated that "[she] used to garden a lot . . . but not now."  *Id.*  Avant further testified that she had no activities she did for fun, or to get outdoors, and that she had no hobbies.  *Id.* at 66.

### C. Claimant's Relevant Medical History

On May 1, 2013, Avant presented at the Alegent Creighton Health Benson Medical Clinic, where Dr. Jeffry Hatcher, DO, evaluated her for dizziness following a motor vehicle accident that occurred on April 13, 2013.  Filing No. 15-9 at 366.[9]  Dr. Hatcher noted that Avant experienced intermittent, spontaneous lightheadedness that was relieved only with rest and time.  *Id.*  Dr. Hatcher stated that Avant also experienced short-term memory loss and was generally not feeling well; she struggled to find the words that she needed, she mumbled when she talked, and she felt that her memory was "not the greatest."  *Id.*[10]  Dr. Hatcher assessed Avant and determined that she had post-concussion syndrome which would take another four to six weeks to resolve, and he

---

[9] Operated by CHI Health.  *See, e.g., id.* at 376.
[10] The medical record from Avant's May 1, 2013 consultation with Dr. Hatcher further noted that "[Avant] forgot on the way [to this doctor's appointment] that she was supposed to come here and forgot the time of the appointment."  *Id.*

encouraged her not to work during that time. *Id.* at 367. The record indicated Avant's active daily prescription medications at the time of this appointment consisted of Prilosec 40 mg, Valium 10 mg, Imitrex 200 mg (for migraines), and Ortho Tri-Cyclen (oral contraceptive/birth control). *Id.*

On May 10, 2013, Avant again saw Dr. Hatcher when she presented for assessment of a headache. *Id.* at 369. Avant described the headache as dull, located throughout her entire head, and denied any relieving factors. *Id.* Dr. Hatcher noted that Avant's symptoms included blurred vision, dizziness, fever, nausea, phonophobia, and photophobia. *Id.* He added Tylenol 300 mg/codeine No. 3 30 mg (up to four times per day to relieve headache pain) to Avant's daily medication regimen, which at this time also included Prilosec 40 mg, Ultram 300 mg, Ibuprofen 2400 mg, Imitrex 200 mg, and Clindamycin HCl 600 mg (for ten days). *Id.* at 370.

On July 31, 2013, Avant saw Dr. Hatcher for a motor vehicle accident follow-up. Avant indicated that she experienced constant, aching, bumping pain in her right wrist, and that there were no relieving factors. *Id.* at 374. She rated the pain severity at five out of ten. *Id.* Her symptoms included crepitus, decreased mobility, swelling, tenderness, weakness, bruising, difficulty sleeping, instability, limping, locking, night pain and consequential awakening, and numbness, popping, spasms, tingling in her arms and legs. *Id.* Dr. Hatcher noted that Avant had bursitis/tendonitis, post-concussion syndrome, neck pain, and that she dealt with ramifications from a motor vehicle accident of unspecified nature. *Id.* at 375. He prescribed Vicodin (Hydrocodone Bitartrate 5 mg, acetaminophen 325 mg) to be taken up to four times per day. *Id.* at 376.

On August 30, 2013, Avant presented at Alegent Creighton Dermatology, where she visited Dr. Christopher Huerter, MD, a dermatologist, and complained of tightening of the skin. Filing No. 15-8 at 336. The medical record indicated that a skin exam revealed lesions that were brown, papule, and with hyperkeratotic scale located on both Avant's hands and feet. *Id.* at 336. Dr. Huerter noted that Avant had congenital keratoderma and prescribed Ammonium Lactate twelve percent external lotion and Tazorac ten percent external cream. *Id.* at 337. Dr. Huerter further noted that Avant's problems with her hands and feet were "a chronic problem" that was "becoming increasingly problematic," and he stated that Avant had difficulty walking because of the tenderness. *Id.* at 336.

On October 15, 2013, Avant saw Derrick Anderson, MD at the Alegent Creighton Health Benson Medical Clinic for evaluation of a migraine episode that started one to four weeks prior, and remained a daily, unchanging occurrence. Filing No. 15-9 at 377. Dr. Anderson noted that Avant's pulsating, throbbing, moderate pain was located in the occipital region, radiated to the left and right neck, and that the quality of the pain was similar to Avant's prior headaches. *Id.* Avant's symptoms included blurred vision, ear pain, nausea, photophobia, and vomiting. *Id.* The record stated that Avant tried triptans and oral narcotics to alleviate the symptoms. *Id.*

On November 13, 2013, Avant saw Dr. Hatcher for evaluation of a migraine and a cyst. *Id.* at 378-379. Dr. Hatcher noted that Avant's migraines were "a chronic problem," and that she was amid a seven-day, gradually worsening episode. *Id.* at 378. The pain, similar to that of prior headaches, was in the frontal region and did not radiate. *Id.* The pain was characterized as sharp and shooting with a severity level of seven out of ten.

*Id.* Symptoms included nausea, phonophobia, photophobia, vomiting, and weight loss. *Id.* Dr. Hatcher also noted a large cystic mass in Avant's left axillary region. *Id.* at 379.[11]

On January 15, 2014, Avant went to the emergency room at Immanuel Medical Center for evaluation of a migraine. Filing No. 15-10 at 430. Dr. Arthur Prine, MD, noted that the pain was severe and throbbing. *Id.* He further noted that Avant felt the precursors of nausea and a headache, so she immediately took a promethazine and Imitrex, but this provided no relief, and she consequently developed further throbbing pain in the frontal and occipital area of her head. *Id.* Avant received diphenhydramine HCl 25 mg and Zofran 4mg intravenously. *Id.*

On February 6, 2014, Avant saw Dr. Hatcher for assessment of a headache episode that occurred daily and started about one month prior. Filing No. 15-9 at 383. Dr. Hatcher noted that the aching, sharp, shooting pain had a severity level of four out of ten and was located in the occipital region. *Id.* Dr. Hatcher stated that Avant's symptoms began about six months prior, lasted about six hours at a time, and that the most severe pain was seven out of ten. *Id.* He prescribed atenolol. *Id.* at 384.

Avant again presented before Dr. Hatcher on March 21, 2014, for an aching, sharp, throbbing migraine with a pain severity level of eight out of ten. *Id.* at 384-385. Dr. Hatcher prescribed nortiptyline. *Id.* at 385. Avant returned to the clinic on April 9, 2014, for evaluation of a similar migraine, but with a pain severity of only five out of ten. *Id.* at 386. Dr. Hatcher prescribed amitriptyline. *Id.* at 387.

---

[11] The record indicates in many places that Avant had a benign lipoma and cysts removed by Dr. Robert Zadalis in December of 2013. *See, e.g.,* Filing No. 15-10 at 454-460. Avant visited Dr. Anderson at the Alegent Creighton Health Benson Medical Clinic on December 14, 2013, to assess post-operative pain and vomiting. Filing No. 15-9 at 380. Dr. Anderson noted that Avant had had multiple cysts removed the day prior and stated that Avant never received her post-operative pain prescriptions, so he prescribed Percocet for pain relief and promethazine for vomiting cessation. *Id.*

Avant went to the Immanuel Medical Center emergency room on May 10, 2014, with complaints of a migraine headache. *Id.* at 420. Dr. Charles Garcia, DO, noted that the migraine was frontal and that Avant described it as "deep" and she stated that "[she] could feel [her] heart beat in [her] head" and that her "head [was] about to explode." *Id.* Avant stated that she vomited five times in the prior two hours. *Id.* Her condition was aggravated by bright lights, loud noises, and movement. *Id.* Avant received Benadryl 25 mg, Zofran 4 mg, and ketorolac 30 mg, all intravenously. Filing No. 15-10 at 421.[12]

On June 25, 2014, Avant visited Dr. Hatcher for aching pain in her left shoulder, elbow, fingers, forearm, hand, and clavicle at a severity level of five out of ten. Filing No. 15-9 at 387. She also experienced muscle weakness and numbness, incontinence, and a migraine with a severity level of five out of ten. *Id.* Dr. Hatcher noted decreased grip strength in Avant's left hand and positive spurlings on her left neck. *Id.* at 388. Dr. Hatcher prescribed Topamax. *Id.* at 389. On August 8, 2014, Dr. Hatcher assessed Avant for bilateral hand numbness and a patchy rash on the palmar surface of her hand and prescribed Topamax and Ultram. *Id.* at 390.

On September 3, 2014, Dr. Hatcher saw Avant for a rash and a neurological problem. *Id.* at 391. The rash was on both hands and was characterized by blistering, pain, peeling, and scaling, for which anti-itch cream, antihistamines, and topical steroids provided no relief. *Id.* Symptoms of Avant's neurological problem were clumsiness, focal sensory loss, and focal weakness, for which acetaminophen and neck support provided

---

[12] Besides the above-mentioned visits to Immanuel Medical Center emergency room in January and May of 2014, respectively, the record indicates that Avant went to that emergency room for severe migraine alleviation and received intravenous medication for migraines on eleven additional occasions. *See* Filing No. 15-10 at 460-464, 469-474, 480-484, 490-493; Filing No. 16 ("Tr. 2") at 516-521, 521-527, 535-540, 545-551, 560-566, 781-786, 835-841.

no relief. *Id.* Dr. Hatcher diagnosed carpal tunnel syndrome and prescribed Lyrica. *Id.* at 392. Avant returned to Dr. Hatcher on September 23, 2014, and described her hand pain as aching, shooting, stabbing pain that radiated from both hands and wrists to both arms and the left neck. *Id.* at 393. She also experienced bilateral hand numbness and right elbow pain. *Id.*

On September 9, 2014, Avant saw Naomi Sampson, ARPN, at Alegent Creighton Dermatology. Filing No. 15-8 at 335. She followed up regarding her palmoplantar keratoderma and requested a refill of a medication that had salicylic acid in it, which was originally prescribed in 2009 and worked well. *Id.* Ms. Sampson noted that Avant continued to soak her feet and hands, which helped alleviate symptoms. *Id.*

On September 18, 2014, Avant underwent an Electromyography procedure ("EMG") by Dr. Mohan Prabu Ayyaswamy, MD. Filing No. 16 ("Tr. 2") at 527. The purpose of the EMG was to evaluate Avant's painful bilateral paresthesia. *Id.* Dr. Ayyaswamy noted the following concerning Avant's motor and sensory nerve conduction studies:

> Bilateral median and right ulnar nerve response were normal. Left ulnar motor nerve response revealed slightly prolonged distal latency with a slightly reduced amplitude and normal conduction velocity. Bilateral lumbrical interossei index did not reveal a significant latency difference. Bilateral median and ulnar sensory nerve response was normal. Right median and radial sensory latencies did not reveal significant latency difference when recorded from the thumb.

*Id.* at 528. Dr. Ayyaswamy concluded that the procedure was a "normal study" and that "there was no electrodiagnostic evidence of median neuropathy at the wrist, definite ulnar neuropathy or radiculopathy bilaterally." *Id.* He also said that a clinical examination showed Avant had right side tennis elbow "with a positive active Cogan's test," and stated that if there was further clinical concern for polyneuropathy, a nerve conduction study should be performed. *Id.*

On October 3, 2014, Avant presented for another dermatology appointment with Ms. Sampson. Filing No. 15-8 at 333. Avant visited as a follow up per her orthopedic surgeon's recommendation. *Id.* Ms. Sampson noted that medication and soaking helped Avant with her palmoplantar keratoderma and skin thickening, but that she continued to experience shooting, electrical-feeling pain on her hands. *Id.* Ms. Sampson commented that Avant was "frustrated and tired of not sleeping as this hand pain [woke] her at night." *Id.*

On October 1, 2014, Avant visited Alegent Creighton Clinic Ortho Surgery, where she saw Dr. Matthew Dilisio, MD, an orthopedic surgeon to whom she was referred by Dr. Hatcher, her primary care provider at the time. *Id.* at 312. Dr. Dilisio noted that Avant complained of severe bilateral palmar hand pain and nerve-type symptoms more in her palms and fingers. *Id.* Dr. Dilisio further stated that Avant said she "tried a little bit of therapy and the Lyrica but has not done any other formal treatment," and that her pain level was significantly debilitating to her employment. *Id.* Dr. Dilisio determined that Avant's best course of action was occupational therapy for desensitization of her hands and modalities, which he stated, "should make her feel much better." *Id.* at 316.

On October 15, 2014, Avant had an appointment with Nurse Sampson to discuss her application for disability. *Id.* at 332. Sampson noted that Avant continued to soak her feet with a mix of vinegar, lemon juice, Listerine, and water; this mixture helped debride the thickened skin, but it returned within three to four days. *Id.*

On October 20, 2014, Dr. Hatcher evaluated Avant again when she presented with bilateral hand pain characterized as aching, shooting, stabbing, cramping, which radiated to both arms at a pain severity level of seven out of ten. Filing No. 15-9 at 394.

Concurrent symptoms were numbness and loss of hand function. *Id.* Dr. Hatcher prescribed Percocet. *Id.* at 395. On November 5, 2014, Avant returned to Dr. Hatcher with neck pain and a migraine. *Id.* at 395-396. The neck pain in her right neck was at a severity level of five out of ten during the day and was stiff at night. *Id.* at 395. The migraine in the bilateral region was similar to past headaches and the aching pain was at a severity level of a nine out of ten. *Id.* On November 8, 2014, Dr. Hatcher evaluated Avant's bilateral pain in her fingers, hands, and wrists. *Id.* at 397. The aching, bumping, pounding pain was at a severity level of eight of ten and was gradually worsening. *Id.* Concurrent symptoms included itching, joint locking and swelling, a limited range of motion, and stiffness. *Id.* Dr. Hatcher prescribed Ultram. *Id.* at 398.

On January 13, 2015, Ms. Sampson again evaluated Avant. Filing No. 15-8 at 322. Ms. Sampson noted that Avant presented to follow up regarding her keratoderma and request that her forty percent salicylic acid with Eucerin be changed to forty percent salicylic acid in Vaseline, as she felt that Vaseline better alleviated her symptoms. *Id.* Ms. Sampson further stated that Avant went to occupational therapy three times per week and received wax treatments on her hands, which kept the skin thickening down. *Id.*

On January 14, 2015, Avant visited Dr. Jeffrey Tiedeman, MD, an orthopedic surgeon at GIKK Ortho Specialists. Filing No. 15-9 at 415. Dr. Tiedeman noted that Avant had: (1) flexor tenosynovitis bilateral wrists; (2) bilateral lateral epicondylitis, right greater than left; and (3) history of an autoimmune disorder of focal plantar and palmar keratoderma. *Id.* He stated that Avant had "fairly diffuse symptoms of pain in her hands which suggest[ed] a component of either median neuritis or flexor tenosynovitis." *Id.* He noted that Avant could have had "some sort of a problem . . . such as connective tissue

16

disorder like lupus." Filing No. 15-8 at 316. Dr. Tiedeman recommended continued nighttime bracing and stretching braces and offered to re-evaluate subsequent Avant's anticipated Mayo Clinic visit. *Id.*

Avant's health records indicate that she began outpatient occupational therapy at Immanuel Rehab OT on November 20, 2014. *Id.* at 309.[13] On January 15, 2015, she was treated by Renee Fisher, OT, who noted that Avant received occupational therapy treatments following a diagnosis of bilateral hand pain and right lateral epicondylitis. *Id.* Ms. Fisher noted that, regarding Avant's ability to carry, move, and handle objects, she was at least twenty percent but less than forty percent impaired, limited, or restricted. *Id.*

Ms. Sampson referred Avant to the Mayo Clinic in Rochester, Minnesota, and Avant visited the Hand Center at the Mayo Clinic on January 20, 2015, where Dr. Mary Jurisson, MD, evaluated her. *Id.* at 353. Dr. Jurisson noted that it was difficult for Avant to use her hands and that over the past year she had had a significant decrease in sensitivity, sensation, and strength, in addition to a feeling of numbness and tingling. *Id.* Dr. Jurisson further noted that Avant's hand difficulties started mildly two or three years prior to her visit to the Mayo Clinic, but were more prominent at the time of the visit: Avant dropped things, her coordination was off, and she could no longer do her work. *Id.* At the time of the appointment, Avant had had symptoms of keratoderma congenita for approximately ten years. *Id.* Dr. Jurrison stated that Avant awakened with pain at night, and as the pain worsened she used tramadol and oxycodone for main management and sleep aids. *Id.* The record also indicated electric shock pain from Avant's elbow to her shoulder, in addition to pain and stiffness at the base of the thumb. *Id.* Avant rated her

---

[13] The record also reveals that Avant underwent both occupational and physical therapy treatments in 2013 following a motor vehicle accident. *See* Filing No. 15-10 at 498-506.

pain six out of ten on a good day and up to nine out of ten on a bad day. *Id.* Additionally, Avant's elbow felt "similar to having hit [her] funny bone but at the lateral elbow which [was] thought at home to be due to lateral epicondylitis," and she had episodes of spasms in her thenar area. *Id.*

Medical evidence on the record revealed that at the time of her Mayo Clinic appointment with Dr. Jurisson, Avant's daily medications were the following: cetirizine 10 mg, Lyrica 75 mg, Percocet (10 mg oxycodone, 325 mg acetaminophen) up to four times per day, promomethazine 100 mg, sumatriptan 1200 mg, topiramate 100 mg, and tramadol 100 mg. *Id.*

Dr. Jurrison evaluated four of Avant's medical issues: (1) bilateral hand sensory loss and paresthesia; (2) bilateral hand pain, especially basal thumb pain; (3) bilateral elbow pain; and (4) bilateral foot pain. *Id.* at 355. Dr. Jurrison's evaluation was inconclusive; she noted that the cause of Avant's symptoms was uncertain. *Id.* Dr. Jurrison expressed the importance of evaluating Avant further for evidence of compression neuropathy, fiber neuropathy, and lateral epicondylitis, and advised Avant that she should pursue a better pharmacological approach to pain management in addition to appropriate lifestyle and cognitive behavior therapy. *Id.* at 355-356.

On January 27, 2015, Avant presented before Dr. Hatcher with complaints of bilateral hand pain and a rash. Filing No. 16-2 at 628. The pain was constant, aggravated by moving, lifting, and palpation, and acetaminophen, elevation, heat, ice, immobilization, NSAIDs, rest, and weight bearing provided no symptom relief. *Id.* Avant also described a chronic, gradually worsening bilateral hand rash. *Id.* Fatigue accompanied the rash. *Id.* Symptoms were swelling, redness, pain, burning, dryness, and peeling, and

analgesics, anti-itch cream, moisturizer, cold compress, oral steroids, topical steroids provided no relief. *Id.* Dr. Hatcher stated that both of Avant's hands and wrists exhibited decreased ranges of motion and tenderness, that her rash was maculopapular and urticarial, and that there was erythema. Filing No. 15-9 at 400. Avant saw Dr. Hatcher again regarding the rash on March 4, 2015. Filing No. 16-2 at 630.[14]

On March 30, 2015, Avant saw Dr. Hatcher for a headache, shoulder pain, and chest pain. *Id.* at 632. Dr. Hatcher diagnosed Avant with pleurisy, for which he provided anaprox and administered decadron 4 mg and depo-medrol 80 mg injections. *Id.* at 633.[15] He also prescribed Percocet for back pain. *Id.*

On April 20, 2015, Avant presented at Dermatology Specialists of Omaha, LLC, to be evaluated by Dr. Jill Nelson, MD, for a skin check. *Id.* at 607. Dr. Nelson noted that Avant had focal palmoplantar keratoderma on her palms and on the soles of her feet. *Id.* The skin was thickened and painful, and the condition caused difficulty and pain walking. *Id.* At the time of appointment, Avant treated her skin with salicylic acid, Tazorac, wax dips, and warm water. *Id.* Dr. Nelson further noted that Avant had brown papules on her wrists. *Id.* Dr. Nelson prescribed Clobetasol Propionate five percent cream and instructed Avant to apply it twice daily to thick affected areas. *Id.* at 608.

On October 6, 2015, Dr. Hatcher stated that he first treated Avant for neuropathy in November of 2013 and that the onset of her palmoplantar keratoderma was September 9, 2014. *Id.* at 625. Dr. Hatcher further noted that Avant had severe hand and foot pain with peeling skin and that the prognosis was poor, incurable. *Id.* He asserted that Avant

---

[14] Avant continued to see Dr. Hatcher for her rash throughout 2015. *See, e.g.,* Filing No. 16-2 at 643.
[15] Pleurisy is an inflammation and swelling of the lining of the lungs. It usually results from an underlying disease or infection. The inflammation causes painful breathing. The primary goal of treating pleurisy is to diagnose and the condition that caused it. *Id.*

had lifetime restrictions regarding limitations of daily activities, limitations of physical activities, and limitations in ability to work; he insisted that Avant could perform "no work, ever." *Id.*

On October 19, 2015, Dr. Hatcher assessed the potential employment repercussions Avant's condition. *Id.* at 654-660. He asserted that Avant could continuously sit for fifteen minutes, after which point she needed to alternate postures by walking for not longer than thirty minutes before she returned to another fifteen-minute sitting interval. *Id.* at 654. He noted that during an eight-hour workday, Avant could cumulatively sit for one hour and cumulatively stand for less than one hour. *Id.* at 655, 656. Dr. Hatcher further noted that in addition to a morning break, a lunch period, and an afternoon break scheduled at approximately two-hour intervals, Avant would need two hours of rest to relieve pain and fatigue from her documented medical impairment. *Id.* at 657-658. He also said that Avant was incapable of lifting anything. *Id.* at 658. Dr. Hatcher insisted that during a typical workday, Avant's pain would constantly interfere with her attention and concentration needed to perform even a simple task. *Id.* at 659. He noted that Avant's neuropathy and palmoplantar keratoderma were lifetime, incurable diseases that would cause her to miss more than four days of work per month. *Id.* at 660.

On October 20, 2015, Dr. Huerter again evaluated Avant's palmoplantar keratoderma. Filing No. 16-3 at 714. He noted that Tazorac gel with lactic acid lotion did not completely alleviate her symptoms. *Id.* Dr. Huerter advised Avant to continue with Tazorac twelve percent lactic acid lotion, and he decided not to treat the palmoplantar keratoderma with an oral retinoid because he was uncertain if Avant could become pregnant. *Id.*

Avant saw Dr. Tyrus Soares, MD, at Alegent Creighton Health Bergan One Professional Center on November 2, 2015, where she complained of chronic bilateral hand and foot pain. *Id.* at 733. She described burning, pins and needles sensations. *Id.* Dr. Soares prescribed gabapentin 300 mg in place of Avant's ongoing Lyrica prescription. *Id.* at 736. However, he stated that he "counseled [Avant] that in [his] practice [he did] not prescribe chronic opiate therapy in the presence of ongoing illegal substance use," so he deferred the hydrocodone prescription to Avant's primary care provider. *Id.*[16]

Dr. Nelson saw Avant for a follow up on November 5, 2015. *Id.* at 718. She noted that Avant's keratoderma palmaris plantaris was treated with Tazorac, salicylic acid forty percent, AmLactin, and Clobetasol five percent cream, but that said treatment plan thinned Avant's skin and caused sensitivity of her feet. *Id.* Dr. Nelson prescribed compounded salicylic acid mixed with Vaseline 120 gm and advised Avant to rotate this treatment with Tazorac ten percent gel and AmLactin cream, and to use Clobetasol five percent cream only sparingly. *Id.* at 719.

Avant saw Ms. Sampson on January 27, 2016 and inquired if there were any new medications for her palmoplantar keratoderma. *Id.* at 739. Ms. Sampson noted that Avant continued to use Tazorac and lactic acid to treat her condition, but was uncomfortable with a potential Soriatane treatment, so Ms. Sampson advised her to continue with her current regimen. *Id.* at 739-740.

---

[16] At this appointment, Dr. Soares administered a urine drug screen test, and Avant's urine tested positive for marijuana. *Id.* at 733, 736. This is the only occasion in the record in which Avant's marijuana use was brought to light.

On March 3, 2016, Avant visited Dr. Robert Drvol, MD, at Alegent Creighton Health Immanuel One Professional Center to establish Dr. Drvol as her primary care provider in place of Dr. Hatcher. Filing No. 16-4 at 742. Dr. Drvol's notes stated:

> [Avant] has focal [palmoplantar] keratoderma. This affects her hands and feet. Gets very thick skin and callus. Has a constant battle with her skin. She uses lotions and salicylic acid. Feet are worse than her hands. Causing her joints to ache. Is unable to use a touch screen phone due to the thickening of the end of her fingers. Has seen several dermatologists for this. Has even done PT for this. Tries not to injure herself. Pain makes it hard to walk. Has been taking Tramadol during the day and Hydrocodone at night. Doesn't like taking this as she has a young daughter. Ibuprofen doesn't help.

Id. Dr. Drvol advised Avant to continue the creams as she used them and prescribed three new daily medications: Meloxicam 15 mg for skin, Nadolol 20 mg for chronic migraines, and citalopram 20 mg daily for anxiety and depression. Id. at 743-744.[17]

Avant saw Dr. Drvol on March 21, 2016, following a motor vehicle accident and subsequent neck injury on March 17, 2016. Id. at 747.[18] Dr. Drvol recommended physical therapy for Avant's neck, and he noted that Avant's migraines were exacerbated by the neck injury, so he increased her Nadolol prescription to 120 mg daily. Id. at 748.

On April 12, 2016, Avant began physical therapy with Ms. Michelle MInemire, PT. Filing No. 16-5 at 786. Avant indicated constant neck pain and shooting pain down her arms occasionally, and stated she only slept a few hours per night due to pain. Id. at 787. Ms. MInemire advised Avant to return to physical therapy two times per week for four to six weeks. Id. at 790.[19]

---

[17] Avant never took the nadolol because it was not covered by her healthcare plan, so Dr. Drvol prescribed Propranolol 20 mg instead. Id. at 745.
[18] The record indicates that Avant received Phenergan and Narcot for beck pain following this accident. Id. at 780.
[19] The record shows that Avant returned to physical therapy eighteen times throughout the summer of 2016. See Filing No. 16-5 and 6 at 792, 796, 799, 804, 805, 811, 815, 819, 823, 827, 841, 845, 847, 851, 854, 856, 861, 864.

On May 23, 2016, Dr. Drvol evaluated Avant's worsening bilateral numbness and pain.  Filing No. 16-4 at 749.  Avant stated that the pain woke her up at night, and when she woke up in the night her hands were numb and asleep.  Id.  She said she dropped things, had weakness, noticed tingling, and that the pain traveled up above the elbows.  Id.  Dr. Drvol advised Avant to continue her treatment regimen for the keratoderma and recommended she wear wrist splints for carpal tunnel syndrome when she used her hands or slept.  Id. at 750.  He referred her to a dermatologist and a hand surgeon.  Id.

Dr. Herschel Stoller, MD, a dermatologist at Center of Dermatology, P.C., evaluated Avant on May 24, 2016.  Filing No. 16-3 at 728.  He noted that she had "keratoderma of the palms and soles," and that such a condition was "genetic in nature."  Id.  Dr. Stoller said that Avant's condition was well-controlled with Tazorac, AmLactin, and forty percent salicylic acid, and he told Avant to continue with those medications because he "had nothing better to offer her as treatment."  Id.

On August 1, 2016, Dr. Drvol saw Avant for fatigue and muscle aches.  Filing No. 16-4 at 751.  She stated that recent wrist injections with Dr. Gangadasu Reddy, a hand specialist, provided little relief.  Id.[20]  Dr. Drvol ordered blood tests to provide potential insight into Avant's fatigue (B12, vitamin D, thyroid levels) and muscle aches (CPK and ANA).  Id. at 753-759.  Id.  All blood work indicated normal levels, except for a slightly high B12 concentration, for which Dr. Drvol advised a decrease in energy drinks.  Id. at 753.

Avant saw Jon Goldsmith, DPM, a podiatrist, on August 20, 2016, at Alegent Creighton Health Immanuel One Professional Center for bilateral foot zinging, sharp pain

---

[20] Avant saw Dr. Reddy on June 2, 2016, and he administered steroid injections in her right and left carpal tunnels (1 cc of one percent lidocaine with 1 cc of 10 mg Kenolog).  Id. at 766.

at a severity level of seven out of ten.  *Id.* at 766.  Dr. Goldsmith noted that Avant's generalized discomfort extended from both of her feet to both of her legs.  *Id.*  Dr. Goldsmith determined that Avant's lower extremity pain was "related to her ataxic gait," so he recommended physical therapy.  *Id.* at 771.

On October 17, 2016, Dr. Drvol prescribed 2 mg Valium for neck pain, to be taken after physical therapy sessions, and Verapamil 120 mg daily in place of Propranolol for migraines.  Filing No. 16-6 at 880.  On December 13, 2016, Dr. Drvol increased the Verapamil dosage to 180 mg and provided Hydrocodone for bilateral hand pain.  *Id.* at 882.  On March 14, 2017, Dr. Drvol increased the Verapamil to 240 mg and the Citalopram to 40 mg.  Filing No. 16-7 at 944.

On December 7, 2016, Avant returned to Dr. Tiedeman.  Filing No. 16-6 at 871.  Dr. Tiedeman evaluated Avant's carpal tunnel syndrome and tenosynovitis in her hands and wrists.  *Id.* at 872.  He opined that there was no surgical approach that would provide predictable benefit.  *Id.* at 871.  Dr. Tiedeman administered a cortisone injection in Avant's right carpal tunnel for relief.  *Id.*  He provided the injection after sterile prop with a combination of Marcaine, Lidocaine, and 1 cc of Decadron.  *Id.*  Dr. Tiedeman recommended the continued use of a splint at night and stretching exercises during the day.  *Id.*

On January 19, 2017, Avant presented at Westroads Rheumatology Associates PC, where she saw William Palmer, MD, for joint pain.  Filing No. 16-7 at 909, 912.  Dr. Palmer diagnosed Avant with fibromyalgia based on the following: fatigue, all-over joint and muscle pain, nonrestorative sleep, chronic headaches, bowel problems, mental fogginess, and paresthesias.  *Id.* at 911.  He prescribed Gabapentin 300 mg daily for pain.

*Id.* Avant returned to Dr. Palmer on February 16, 2017, and he prescribed (in addition to the Gabapentin) Cyclobenzaprine HCl 10 mg for sleep and injected Depomedrol 40 mg. *Id.* at 906.

Ted Lampkin, LIMHP conducted a psychological interview with Avant on March 2, 2017. *Id.* at 931. Mr. Lampkin noted that Avant's health issues caused her to be depressed since approximately 2015. *Id.* at 930. He stated that Avant was sad, lacked motivation, had feelings of worthlessness, crying spells, and anger. *Id.* Avant stated that she lost her job due to her medical condition and that she had problems with her daughter at home, which caused additional stress. *Id.* Mr. Lampkin noted that Avant had an acute adjustment disorder with a depressed mood, and that the condition was of moderate severity. *Id.* at 931. He spoke with Avant about coping skills she could use to help with her depression, and gave her a GAF score of 55.[21]

On May 24, 2017, Dr. Tiedmann evaluated Avant's "catching and stiffness" in her fingers and occasional wrist pain. *Id.* at 949. He described her condition as "tenosynovitis with bilateral writs and long finger involvement." *Id.* Dr. Tiedeman injected both of Avant's long fingers with a combination of one percent plain Lidocaine and 1 cc of Celestone. *Id.*

On June 26, 2017, Dr. Drvol opined that Avant had left shoulder pain as a result of a motor vehicle accident in March of 2016. *Id.* at 958. He asserted that Avant's shoulder

---

[21] The Global Assessment of Functioning ("GAF") score is the clinician's judgment of the individual's overall level of functioning. *See* Diagnostic and Statistical Manual of Mental Disorders, DSM—IV-TR, 32 (4th ed. 2000). A GAF score of 50-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 34. A new edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) was released in 2013 and replaced the DSM-IV. The DSM-V "no longer uses GAF scores to rate an individual's level of functioning because of 'its conceptual lack of clarity' and 'questionable psychometrics in routine practice.'" *Alcott v. Colvin,* No 4:130CV001074-NKL, 2014 WL 4660364, at *6 (W.D. Mo. Sept. 17, 2014).

pain and migraines were severe and interfered with her ability to concentrate, work, and be active, and he noted that Avant must avoid heavy lifting.  *Id.*

### D.  The ALJ's Findings

The ALJ found that Avant was not disabled.  Filing No. 15-2 at 25.  The ALJ undertook the standard five-step sequential process for analyzing and determining credibility.  *Id.* at 16-25.  The ALJ found that Avant had not engaged in substantial gainful activity since September 9, 2014, the alleged onset date.  *Id.* at 17.  The ALJ agreed with the finding that Avant suffered from multi-joint osteoarthritis, fibromyalgia, peripheral neuropathy in upper and lower extremities, obesity, bilateral carpal tunnel syndrome, lateral epicondylitis, flexor tenosynovitis, congenital palmoplantar keratoderma, migraine headaches, history of cervical strain, and status post motor vehicle accident, and that all of these impairments were severe.  *Id.* at 17-18.

The ALJ concluded that Avant's severe impairments did not meet or medically equal any listed impairment in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526), so as to render Avant presumptively disabled. Filing No. 15-2 at 18.  The ALJ found that Avant did not demonstrate that she was unable to effectively perform fine and gross movements effectively per the mandates of 1.02, she did not have nerve root compression, spinal arachnoiditis, or pseudoclaudication in accord with 1.04, and she did not establish inability to effectively ambulate.  *Id.*  Further, the ALJ noted that Avant's obesity could impact her musculoskeletal symptoms, but that her obesity did not meet a listing when considered in conjunction with her other

impairments, and did not alone equal a listing.  *Id.*  The ALJ also found that neither Avant's migraines, fibromyalgia, nor carpal tunnel syndrome equaled a listing.  *Id.* at 18-19.[22]

The ALJ determined that Avant had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a).  *Id.* at 19. The ALJ found the following postural, environmental, and manipulative limitations: restricted from climbing ropes, ladders, or scaffolds; could only occasionally balance, stoop, kneel, crouch, crawl, climb ramps or stairs; could not perform work that involved vibration or workplace hazards, which included moving mechanical parts and unprotected heights; no exposure to pulmonary irritants, dust, odors, gasses, or fumes; only occasional exposure to temperature extremes or humidity; only occasional pushing and pulling or operating of foot controls with both lower extremities; and only occasional feeling, fingering, and handling with both upper extremities.  *Id.*

The ALJ acknowledged that Avant's medically determinable impairments could cause some of the alleged symptoms.  *Id.* at 20.  However, the ALJ did not afford great weight to Avant's testimony because her "statements concerning the intensity, persistence and limiting effects of those symptoms [were] not entirely consistent with the medical evidence and other evidence on the record . . ."  *Id.*  As such, the ALJ allowed

---

[22] Neither migraine headaches, fibromyalgia, nor carpal tunnel syndrome were listed impairments.  In Avant's case, a medical expert did not opine that her migraines or fibromyalgia equaled a listing, which was required for a finding of equivalence with a listing.  *Id.*  The ALJ used Listings 11.02C and 1.00B as guides when he evaluated Avant's carpal tunnel syndrome.  Listing 11.00C, as related to carpal tunnel syndrome, required documented evidence of persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, or ataxia and sensory disturbances, or interference with the use of fingers, hands and arms.  *Id.* at 19.  Listing 1.00B required documented evidence that the claimant is unable to use upper extremities to effectively carry out activities of daily living.  *Id.*  The ALJ concluded that Avant's medical records did not demonstrate clinical findings that showed she had persistent disorganization of motor function or was otherwise unable to use her upper extremities effectively.  *Id.*

Avant's statements to affect her ability to work only insofar as they were consistent with objective and other evidence.  *Id.*

The ALJ granted partial weight to the opinions of consulting state medical non-examiners.  *Id.* at 23.  These consultants never met Avant, but they underwent a comprehensive analysis of her medical records, and they provided detailed narratives which explained the evidence they used to reach their conclusion that Avant could perform light work with some limitations.  *Id.*  The ALJ adopted most the medical consultants' opinions because he stated that they were consistent with physical examinations and objective findings, but he further reduced her work from light to sedentary.  *Id.*

Additionally, the ALJ gave partial weight to the medical opinion of Dr. Robert Drvol, Avant's primary treating physician.  *Id.*  Dr. Drvol opined that Avant's pain limited her concentration, and she had to avoid heavy lifting.  *Id.*  The ALJ stated that "because [Dr. Drvol's] opinion is general and vague, it is of limited use."  *Id.*

The ALJ gave no weight to the medical opinion of another of Avant's treating physicians, Dr. Jeffery Hatcher.  *Id.*  Dr. Hatcher opined that Avant could only walk or stand for thirty minutes, could sit for one hour, and had to rest for two hours.  *Id.*  The ALJ criticized Dr. Hatcher: "[he] did not provide any explanation or references to medical signs or findings of record to support his conclusions.  Instead, his opinions are presented in a checkbox format without narrative discussion of the basis for each limitation."  *Id.*

Finally, the ALJ gave only partial weight to the third-party function reports submitted by Avant's parents, Anthony and Brenda Avant.  *Id.*  The reports chronicled Mr. and Mrs. Avants' substantial assistance to their daughter with management of her

finances, cooking, shopping, child, and pet care. *Id.* The ALJ did not afford Mr. and Mrs. Avants' respective reports great weight because "[Mr. and Mrs. Avant] are not disinterested third parties, and their statements may be motivated by sympathy or pecuniary interest." *Id.* at 23-24.

### E. Vocational Expert's Relevant Testimony at the ALJ Hearing

A vocational expert also testified at the hearing. *Id.* at 66-72. She addressed the issue of whether a worker with a high school education plus two years of college could either go back to past work as a phlebotomist, certified nursing aide, or store laborer, or could perform other sedentary work. *Id.* at 67-69. The vocational expert was asked to assume that the claimant was limited to no more than occasional balancing, stooping, kneeling, crouching, crawling, or climbing of ramps and stairs; should not climb ropes, ladders, or scaffolds; should not be involved with vibration or workplace hazards such as moving mechanical parts or unprotected heights; should avoid pulmonary irritants such as dusts, odors, gasses, of fumes; should have no more than occasional exposure to temperature extremes, dampness, or humidity; should perform no more than occasional pushing, pulling, or operation of foot controls with both lower extremities; should perform no more than occasional fingering and handling and no more than frequent feeling with both upper extremities. *Id.* at 68-69. The vocational expert testified that, with those restrictions, the claimant's past work would be precluded. *Id.* at 69. Further, she testified that the above restrictions left only one sedentary, unskilled job in the national economy that the hypothetical claimant could perform: that of a callout operator. *Id.* The vocational expert further testified that there existed 11,580 callout operator positions in the national economy. *Id.*

The vocational expert was then asked to assume that the hypothetical claimant with all of the above limitations could perform no more than thirty minutes of uninterrupted sitting or standing without the option to change position at least briefly three to five minutes before resuming the other position. *Id.* at 70. With this altered hypothetical, the vocational expert testified that a callout operator position would not be available, as employees who alternate between sitting and standing and take three to five-minute breaks "couldn't complete the job task at a competitive rate." *Id.* The vocational expert was then asked to again alter the first hypothetical and limit fingering to "less than occasionally" but leave handling at "occasional." *Id.* In this instance, as in the previous altered hypothetical, the vocational expert testified that the occupation of callout operator would not be available; there would be no potential occupations for the claimant. *Id.* at 71.

### F. Issues on Appeal

In this appeal, Avant alleges: (1) that the ALJ erred in finding that 11,580 jobs constitute a significant number in the national economy; and (2) that the ALJ erred in finding that the job of callout operator was a "representative job."

## II. DISCUSSION

### A. Law and Analysis

#### 1. Standard of Review

When reviewing a Social Security disability benefits decision, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995). Rather, the district court's review is limited to an inquiry into whether there is substantial evidence on the

record to support the findings of the ALJ and whether the ALJ applied the correct legal standards. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011); *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000). Substantial evidence means something less than a preponderance of the evidence, but more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Moore v. Astrue,* 572 F.3d 520, 522 (8th Cir. 2009) (quoting *Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003)); *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938). However, this "review is more than a search of the record for evidence supporting the [ALJ or Commissioner's] findings," and "requires a scrutinizing analysis." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008). In determining whether there is substantial evidence to support the Commissioner's decision, this court must consider evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Finch v. Astrue,* 547 F.3d 933, 935 (8th Cir. 2008).

### 2. Sequential Analysis

The Social Security Administration has promulgated a sequential process to determine whether a claimant qualifies for disability benefits. *See* 20 C.F.R. § 404.1520(a)(4). The determination involves a step-by-step analysis of the claimant's current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and his or her age, education and work experience. *Id.* At step one, the claimant has the burden to establish that he or she has not engaged in substantial gainful activity since his or her alleged disability onset date. *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013). At step two, the claimant has the burden to prove he or she

has a medically determinable physical or mental impairment or combination of impairments that significantly limits his or her physical or mental ability to perform basic work activities. *Id.* At step three, if the claimant shows that her impairment meets or equals a presumptively disabling impairment listed in the regulations, he or she is automatically found disabled and is entitled to benefits. *Id.* If not, the ALJ determines the claimant's RFC, which the ALJ uses at steps four and five. 20 C.F.R. § 404.1520(a)(4).

A claimant's RFC is what he or she can do despite the limitations caused by any mental or physical impairments. *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014); 20 C.F.R. § 404.1545. The ALJ is required to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. *Papesh v. Colvin,* 815 F.3d 1126, 1131 (8th Cir. 2015). The RFC must (1) give appropriate consideration to all of a claimant's impairments; and (2) be based on competent medical evidence establishing the physical and mental activity that the claimant can perform in a work setting. *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016).

At step four, the claimant has the burden to prove he or she lacks the RFC to perform his or her past relevant work. *Cuthrell*, 702 F.3d at 1116. If the claimant can still do his or her past relevant work, he or she will be found not disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy the claimant can perform. *Id.; see Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010).

### 3. Vocational Expert and Hypothetical Question

To satisfy the Commissioner's burden of showing the claimant is capable of performing other work, the ALJ is generally required to utilize testimony of a vocational expert if the claimant suffers from non-exertional impairments that limit his or her ability to perform the full range of work described in one of the specific categories set forth in the guidelines. *Jones,* 619 F.3d at 971-972. In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question that comprises all of the claimant's impairments. *See Taylor v. Chater,* 118 F.3d 1274, 1278 (8th Cir. 1997) (stating that a vocational expert's testimony may be considered substantial evidence "only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies"). "When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence." *KKC ex rel. Stoner v. Colvin,* 818 F.3d 364, 377 (8th Cir. 2016) (quoting *Hunt v. Massanari,* 250 F.3d 622, 626 (8th Cir. 2001)).

### a. Job Availability: "Significant Numbers"

Both of the arguments that Avant presents focus on the vocational expert's hearing testimony that a hypothetical individual with Avant's vocational profile and RFC could perform 11,580 callout operator jobs in the national economy. This Court finds that the ALJ erred in finding that 11,580 jobs constitute significant numbers in the national economy. Once a claimant establishes that he or she is unable to perform his or her former job, the burden shifts to the Secretary to show the claimant can engage in other work which exists in "significant numbers" in the region where the claimant lives. *Jenkins*

*v. Bowen*, 861 F.2d 1083, 1086 (8th Cir. 1988). Vocational expert testimony that reflects "significant numbers" typically cite regional job availability *or* present multiple national jobs. *See Id.*; *see Welsh v. Colvin*, 765 F.3d 926 (8th Cir. 2014). The Eighth Circuit has held, for instance, that a vocational expert's testimony that a claimant could perform 330 sedentary, unskilled jobs in his or her region and 36,000 jobs in the national economy was an appropriate representation of significant numbers of potential jobs. *See Welsh*, 765 F.3d at 930.

Dissimilarly, Avant retained the capacity to perform only one occupation and the vocational expert did not testify about regional job availability. Under the familiar sequential analysis, the burden is on the Commissioner to prove that there are jobs in the economy that Avant can perform. The Commissioner did not meet that burden. The substantial evidence on the record does not support a conclusion that Avant retained the residual functional capacity to perform work that exists in the national economy. Here, the vocational expert provided only one potential occupation for Avant: callout operator. While the vocational expert declared that 11,580 callout operator jobs existed nationally (notably less than the 36,000 in *Welsh*), she was never asked to, and consequently did not provide, regional callout operator job availability. Because the ALJ erred in determining that a finding of disability was precluded by 11,580 potential callout operator jobs, this court finds Avant presumptively disabled.

However, this court will address the remaining issues in the alternative.

### b. Callout Operator as a Representative Job

This Court further holds that the ALJ erred in finding that the job of a callout operator was a "representative job." The ALJ noted that "the vocational expert testified

that given all of these favors [Avant] would be able to perform the requirements of representative occupations such as callout operator." Tr. 1 at 25. In *Johnson v. Chater*, the ALJ found that the claimant could potentially perform the jobs of addresser, document preparer, or telemarketer after the vocational expert expressly testified that the jobs mentioned were merely a representative sampling of a multitude of jobs that the claimant would be capable of performing. *Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997).

The term "representative" implies the existence of more than one job that Avant could potentially perform based on the requisite RFC, yet the vocational expert testified only to one such occupation. In the instant case, contra *Johnson*, the vocational expert did not provide callout operator as one job that was representative of many that Avant could undertake. The unequivocal evidence on the record clearly reflects the vocational expert's testimony that there existed only one job Avant was capable of based on her RFC determination, so the ALJ mischaracterized the vocational expert's findings. Because there is not substantial evidence in the record for the ALJ's decision that callout operator is "representative," but rather that it embodies the entirety of available jobs, this court finds Avant disabled.

### 4. Substantial Evidence in Support of Disability Finding

Avant's comprehensive record contains substantial relevant evidence which overwhelmingly supports the conclusion that she is disabled. The record as a whole offers no substantial evidence to support the ALJ's determination that Avant is not disabled. In denying Avant's claim, the ALJ discounted Avant's subjective complaints of severe pain. The ALJ erred in determining that a finding of disability was precluded by Avant's daily activities. The ALJ relied on the testimony that Avant lives independently

with her daughter and dogs, cooks simple meals, drives short distances to pick her daughter up from school, visits her parents, and watches television. These activities are not inconsistent with severe pain. Rather, the evidence shows that Avant's activities are limited by her pain.

The ALJ failed to consider the objective medical evidence which supports Avant's allegations of disabling pain. Objective medical evidence on the record demonstrates that Avant consistently reported the intensity of her symptoms to health care providers. The diagnoses on the record of palmoplantar keratoderma and migraines, compounded with treatment for depression and chronic nerve and joint pain, reveal that Avant consistently sought medical treatment for relief of her symptoms. There is nothing in the record to show that a medication or therapy regime would remedy Avant's conditions. Avant's testimony and medical records leave little doubt that her treating physicians regarded her conditions as intractable.

The ALJ failed to properly credit the opinions of Avant's treating physicians because there is substantial evidence that she suffers from impairments that interfere with her ability to work (it appears that several of Avant's impairments are close to, if not at, listing-level severity). The opinions presented by the Commissioner's medical consultants does not counter these opinions. In sum, the ALJ's reasons for discrediting Avant's testimony and the opinions of her treating physicians are not adequate to offset the substantial evidence on the record which supports a finding of disability. This Court holds that the extensive evidence renders Avant disabled.

### III.    CONCLUSION

The clear weight of the evidence points to a conclusion that Avant has been disabled since her alleged onset date of September 9, 2014.  Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate.  *See Hutsell v. Massanari*, 259 F.3d 707, 709 (8th Cir. 2001).  Accordingly,

IT IS ORDERED that the plaintiff's motion to reverse (Filing No. 20) is granted; that the defendant's motion to affirm (Filing No. 22) is denied; that the decision of the Commissioner is reversed; and that this action is remanded to the Social Security Administration for an award of benefits.

Dated this 28th day of August 2019.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge